**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

| | | |
|---|---|---|
| KRISTIN NICOLE SCRIPTER,<br><br>Plaintiff,<br><br>v.<br><br>REGIONAL ACCEPTANCE CORPORATION;<br>EQUIFAX INFORMATION SERVICES LLC;<br>and EXPERIAN INFORMATION SOLUTIONS, INC.,<br><br>Defendants. | :<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>: | Civil Action No.: _______________<br><br><br>**COMPLAINT AND DEMAND FOR JURY TRIAL** |

**<u>COMPLAINT AND DEMAND FOR JURY TRIAL</u>**

Plaintiff Kristin Nicole Scripter, by and through undersigned counsel, alleges as follows:

## <u>PRELIMINARY STATEMENT</u>

1. This is an action for damages under the Fair Credit Reporting Act, 15 U.S.C. § 1681 et seq. (the "FCRA"), arising from the reporting of two consumer credit delinquencies that, on the furnisher's own books and records, could not have occurred.

2. Plaintiff financed the purchase of a vehicle on August 9, 2025. Eight days later, the vehicle was destroyed in a collision. Her insurer paid, and Defendant Regional Acceptance Corporation ("RAC") received and applied, $27,405.82 on August 28, 2025 — twenty-six days before the first monthly installment of $807.79 was due, and an amount equal to nearly thirty-four monthly installments. Two further payment streams, a service-contract cancellation refund and guaranteed asset protection ("GAP") proceeds, retired the balance in full on November 17, 2025.

3. On every scheduled due date, RAC held funds exceeding everything then owed by tens of thousands of dollars. RAC's own ledger reflects a "Paid Through Date" of November 23, 2025, a zero principal balance as of November 17, 2025, and the affirmative waiver of both late fees it had assessed. RAC nevertheless furnished, and Defendants Equifax Information Services LLC ("Equifax") and Experian Information Solutions, Inc. ("Experian") published and continue to publish, a thirty-day delinquency for October 2025 and a sixty-day delinquency for November 2025.

4. Plaintiff disputed the reporting repeatedly. Equifax conducted four separate reinvestigations in a single week in January 2026 and, in the course of doing so, reported three mutually inconsistent past-due figures for the very same months, while leaving the delinquency codes intact. Experian, after locking Plaintiff out of the account through which she was entitled to dispute, "verified" the tradeline as accurate. RAC, confronted with its own ledger, took the position that insurance, service-contract, and GAP proceeds are "not payments," then blocked Plaintiff from responding through its messaging system. This action follows.

## JURISDICTION AND VENUE

5. This Court has federal question jurisdiction under 15 U.S.C. § 1681p and 28 U.S.C. § 1331.

6. Venue is proper in this District under 28 U.S.C. § 1391(b) because Plaintiff resides in this District, each Defendant transacts business in this District, and a substantial part of the events giving rise to Plaintiff's claims — including the publication of the inaccurate consumer reports to and about Plaintiff — occurred in this District.

## PARTIES

7. Plaintiff Kristin Nicole Scripter is a natural person residing in Fowlerville, Livingston County, Michigan, and is a "consumer" as defined by 15 U.S.C. § 1681a(c).

8. Defendant Regional Acceptance Corporation is a North Carolina corporation with a principal place of business at 1424 East Fire Tower Road, Greenville, North Carolina 27858, and an affiliate of Truist. RAC regularly furnishes information relating to consumers to one or more consumer reporting agencies and is a "furnisher" within the meaning of 15 U.S.C. § 1681s-2.

9. Defendant Equifax Information Services LLC is a Georgia limited liability company with a principal place of business at 1550 Peachtree Street N.W., Atlanta, Georgia 30309. Equifax is a "consumer reporting agency" as defined by 15 U.S.C. § 1681a(f) and regularly assembles and evaluates consumer credit information for the purpose of furnishing consumer reports, as defined by 15 U.S.C. § 1681a(d), to third parties.

10. Defendant Experian Information Solutions, Inc. is an Ohio corporation with a principal place of business at 475 Anton Boulevard, Costa Mesa, California 92626. Experian is a "consumer reporting agency" as defined by 15 U.S.C. § 1681a(f) and regularly assembles and evaluates consumer credit information for the purpose of furnishing consumer reports, as defined by 15 U.S.C. § 1681a(d), to third parties.

## FACTUAL ALLEGATIONS

### A. The Retail Installment Contract

11. On August 9, 2025, Plaintiff purchased a 2021 Jeep Wrangler, VIN 1C4HJXDG8MW722786, from CDJR of Leesburg in Fruitland Park, Florida, under a Retail Installment Sale Contract — Simple Finance Charge (the "Contract").

12. The Contract disclosed an Amount Financed of $36,642.03, an Annual Percentage Rate of 14.20%, and a payment schedule of 66 monthly installments of $807.79 each, "Monthly beginning 09/23/2025."

13. The Contract provided for a late charge of five percent of the installment if a payment was "not received in full within 10 days after it is due." Five percent of $807.79 is $40.39.

14. As part of the transaction, Plaintiff purchased an optional GAP contract for $1,000.00 and an optional vehicle service contract ("DGW VSC – STANDARD") for $3,587.00, both of which were financed and made part of the Contract.

15. On the same day, the seller assigned the Contract to RAC. RAC serviced the obligation as account number 1000272282.

**B. The Total Loss and RAC's Receipt of Funds**

16. On August 17, 2025 — eight days after origination, and more than a month before the first installment came due — the vehicle was destroyed in a collision and declared a total loss.

17. Plaintiff's automobile insurer promptly adjusted and paid the claim. RAC's own account ledger records the following entry:

18. *08/28/2025 — "Post Proceeds" — source "INSCHECK" — $27,405.82, allocated $27,405.82 to principal, reducing the principal balance from $36,642.03 to $9,236.21.*

19. The first installment was not due until September 23, 2025. RAC therefore received and applied $27,405.82 twenty-six days before any payment was owed. That sum equals approximately 33.93 monthly installments.

20. RAC's ledger further records a "Post Proceeds" entry on October 15, 2025 from source "CNCLINSPRD" in the amount of $3,856.03 — the refund of unearned charges on the cancelled vehicle service contract — allocated entirely to principal and reducing the balance to $5,380.18. That posting occurred eight days before the second installment came due.

21. RAC's ledger records a final "Post Proceeds" entry on November 17, 2025 from source "GAPCHECK" in the amount of $5,512.16, allocated $5,380.18 to principal and $131.98 to interest, and reducing the principal balance to $0.00. That posting occurred six days before the third installment came due.

22. In total, RAC received and applied $36,774.01 against an Amount Financed of $36,642.03. The principal allocations — $27,405.82, $3,856.03, and $5,380.18 — sum precisely to $36,642.03.

## C. No Installment Was Ever Past Due

23. Measured against RAC's own postings, the account carried an enormous surplus on every scheduled due date:

| Installment Due Date | Installment Amount | Cumulative Amount Due | Cumulative Funds Received by RAC | Surplus |
|---|---:|---:|---:|---:|
| September 23, 2025 | $807.79 | $807.79 | $27,405.82 | $26,598.03 |
| October 23, 2025 | $807.79 | $1,615.58 | $31,261.85 | $29,646.27 |
| November 23, 2025 | $807.79 | $2,423.37 | $36,774.01 | $34,350.64 |

24. The account could not have been thirty days past due in October 2025. As of the October 23, 2025 due date, RAC held $31,261.85 against a cumulative obligation of $1,615.58.

25. The account could not have been sixty days past due in November 2025. RAC's ledger shows a principal balance of $0.00 as of November 17, 2025 — before the November 23, 2025 installment was even due.

26. RAC's ledger says as much. The December 18, 2025 "Payoff" entry carries a "Paid Through Date" of 11/23/2025 — that is, through the third and final scheduled installment date at issue.

27. RAC also affirmatively unwound the only contemporaneous indicia of delinquency it had created. Having assessed a $40.39 late fee on October 3, 2025 (ten days after the September 23 due date) and a second $40.39 late fee on November 2, 2025 (ten days after the October 23 due date), RAC entered two "Waive Fee — LATEFEE" reversals on December 18, 2025, together with an "Int Credit Adj — WAIVEINT" of $380.42.

28. By letter dated July 13, 2026, RAC confirmed in writing that the account "effectively shows a zero balance as of December 18, 2025."

29. There is thus no set of facts, on RAC's own records, under which Plaintiff missed an installment, was ever thirty days past due, or was ever sixty days past due.

**D. Defendants' Inaccurate Reporting**

30. Notwithstanding the foregoing, RAC furnished to Equifax and Experian, and Equifax and Experian published in consumer reports concerning Plaintiff, a status code of "1" (30–59 days past due) for October 2025 and a status code of "2" (60–89 days past due) for November 2025.

31. Equifax has published, and continues to publish, the account status "Account closed; was 60 – 80 Days Past Due," together with a Date of First Delinquency of 10/01/2025.

32. The reported Date of First Delinquency is inaccurate on its face and irreconcilable with the Contract. With a first installment due September 23, 2025 and a ten-day grace period, no delinquency could arise on October 1, 2025 under any accounting.

33. As of a tri-bureau consumer report dated July 22, 2026, Equifax reported the RAC tradeline with an Account Status of "Open," a Current Payment Status of "Late 60 Days," Responsibility "Undesignated," Months Reviewed of "0," Terms Count of "0," and High Balance and High Credit of "$0.00." Equifax thus represented to any user of the report that Plaintiff had an open automobile loan that was, at that moment, sixty days delinquent — more than seven months after the account was paid in full and closed.

34. As of the same July 22, 2026 report, Experian continued to report the tradeline with "Times 30/60/90 Days Late" of "1/1/0" and a payment-history grid showing "30" for October 2025 and "60" for November 2025.

35. The reporting is inaccurate. In the alternative, and at a minimum, it is materially misleading in such a way and to such an extent that it can be expected to adversely affect credit decisions. A tradeline bearing consecutive 30- and 60-day delinquency codes conveys to any user that the consumer stopped paying. Here, the creditor was in possession of more than thirty-three installments' worth of the consumer's money before the first payment was ever due, and the delinquency codes appear nowhere alongside any notation of casualty loss, insurance proceeds, or GAP satisfaction.

36. The inaccuracy is factual, not a matter of legal characterization. Whatever label is affixed to the funds, the objectively verifiable facts are that (a) RAC received and applied them, (b) it did so before the corresponding installment due dates, (c) its ledger records the

account as paid through November 23, 2025, and (d) it waived the associated late fees and interest.

37. Trans Union, which also received the same disputed information, deleted the RAC tradeline from Plaintiff's Trans Union file.

## E. Plaintiff's Disputes to Equifax and Equifax's Response

38. Plaintiff disputed the RAC tradeline with Equifax on multiple occasions, including disputes resolved by Equifax reinvestigation results dated January 6, 2026 (Confirmation No. 5365518997), January 8, 2026 (Confirmation No. 6008552032), January 9, 2026 (Confirmation No. 6009536854), and January 10, 2026 (Confirmation No. 6010584059).

39. Each dispute placed Equifax on notice that the account had been satisfied by insurance, service-contract, and GAP proceeds received before the corresponding installment due dates, and that the October and November 2025 delinquency codes were therefore false.

40. Equifax did not delete or correct the delinquency codes in response to any of the four disputes. Its January 6, 2026 result advised that "the information you disputed has been verified as accurate." Its January 8, 9, and 10, 2026 results advised only that certain fields had been "modified," while preserving the status codes "1" for 10/2025 and "2" for 11/2025 and the status legend "Account closed; was 60 – 80 Days Past Due."

41. Equifax's four reinvestigation results are internally irreconcilable with one another. For October 2025, Equifax reported an "Amount Past Due" of $848 on January 6, 2026, and $0 on January 8, 9, and 10, 2026. For November 2025, Equifax reported an "Amount Past Due" of $461 on January 6, 2026, $0 on January 8 and 10, 2026, and $1 on January 9, 2026. Equifax also reported a Date Closed of 12/01/2025 in one result and 12/31/2025 in the others — neither of which matches RAC's own payoff date of December 18, 2025.

42. These shifting figures for identical months, generated within four days of one another from the same furnisher, demonstrate that Equifax did not conduct a reasonable reinvestigation and did not maintain reasonable procedures to assure the maximum possible accuracy of the information it published.

43. Equifax further reported Plaintiff's name as "KRISTIN SCHIPTER," a misspelling of Plaintiff's surname, in each of its reinvestigation results and in its file disclosure.

44. Equifax parroted RAC's response rather than evaluating the documentation Plaintiff supplied, and continued to rely on RAC as a source of verification after it had reason to know that RAC's reporting was contradicted by RAC's own ledger.

**F. Plaintiff's Disputes to Experian and Experian's Response**

45. Plaintiff attempted to dispute the RAC tradeline directly with Experian but was unable to do so. She could not log in to her Experian consumer account, submit disputes, upload documentation, or request a description of the reinvestigation procedure. On one occasion she was misdirected to Experian's United Kingdom operation, which confirmed it could not assist with a United States credit file; on another she was told her account had been unlocked when it had not been.

46. On January 13, 2026, Plaintiff submitted a detailed dispute to Experian through the Consumer Financial Protection Bureau complaint portal, assigned Complaint No. 260114-27752797. The dispute identified the account, recited the posting dates and amounts of the insurance, service-contract, and GAP proceeds, explained why no installment could have been past due, and attached supporting documentation.

47. Experian treated the submission as a dispute and conducted a reinvestigation. In its response dated March 8, 2026, Experian stated: "Per your request to conduct a

reinvestigation, we contacted the data furnisher(s) for disputed items on your Experian credit report and asked them to verify the accuracy of the information with which you disagree. They responded and verified that the remaining disputed information was accurate as reported."

48. Experian did not delete or correct the October and November 2025 delinquency codes. It continued to publish them, as reflected in the July 22, 2026 report described above.

49. Experian's reinvestigation consisted of nothing more than transmitting the dispute to RAC and adopting RAC's answer. Experian did not review the documentation Plaintiff submitted, did not evaluate the ledger, and did not consider that the account's own transaction history refuted the reported delinquencies on its face.

## G. RAC's Receipt of the Disputes, Investigation, and Admissions

50. Equifax and Experian each forwarded notice of Plaintiff's disputes to RAC, as required by 15 U.S.C. § 1681i(a)(2). Equifax's reinvestigation results identify RAC as the furnisher contacted and reflect field modifications that could only have originated from RAC. Experian's March 8, 2026 response states that it contacted the furnisher and that the furnisher "responded and verified" the information.

51. RAC also received Plaintiff's disputes directly, including through CFPB Complaint Nos. 251231-27325172 and 260109-27598511.

52. By written response dated January 9, 2026, signed by Jane E. Williams, Vice President of Operations and Process Improvement Manager, RAC confirmed each of the following: that insurance proceeds of $27,405 were posted on August 28, 2025; that a warranty rebate was posted on October 15, 2025; that a GAP claim was posted on November 17, 2025; and that the remaining balance was zeroed out on December 18, 2025.

53. In the same response, RAC asserted that these credits were "not payments" and that it would therefore continue to report 30- and 60-day delinquencies while simultaneously reporting the account as paid and closed with a zero balance.

54. RAC's stated position cannot be reconciled with its own records. RAC applied every dollar of the proceeds to principal and interest under the Contract. It recorded a Paid Through Date of November 23, 2025. It waived both late fees and $380.42 of interest. An obligation that a creditor's books show as paid through a given date cannot simultaneously be reported as sixty days past due as of that same date.

55. RAC has never produced, and cannot produce, a billing-cycle ledger, interest-accrual schedule, or delinquency calculation supporting the reported delinquencies.

56. After issuing the January 9, 2026 response, RAC blocked Plaintiff's ability to reply through its consumer messaging system. Plaintiff's attempts to submit a rebuttal, documentation, or clarification were rejected and would not transmit, forcing her to initiate a further CFPB complaint.

57. RAC's conduct was not the product of a reasonable investigation. A reasonable investigation would have required nothing more than opening the account ledger that RAC itself later produced to Plaintiff.

**H. Damages**

58. As a direct and proximate result of Defendants' conduct, Plaintiff has suffered actual damages, including damage to her credit reputation and creditworthiness, loss of the ability to obtain and benefit from credit on favorable terms, out-of-pocket expenses, lost time and effort devoted to disputing the inaccurate reporting over a period exceeding one year, and emotional distress, humiliation, anxiety, and frustration.

59. Plaintiff's VantageScore 3.0 scores as of July 22, 2026 were 610 (Trans Union), 613 (Equifax), and 613 (Experian). The delinquency codes at issue are among the only derogatory items reported on Plaintiff's Equifax and Experian files during the relevant period arising from post-2024 conduct.

60. Defendants' conduct was willful within the meaning of 15 U.S.C. § 1681n. Each Defendant was placed on actual notice that the reported delinquencies were contradicted by the furnisher's own transaction ledger, and each elected to continue publishing or furnishing the information anyway. RAC in particular acted in knowing or reckless disregard of its statutory obligations by adopting a position it knew its own records refuted, and by then foreclosing the consumer's ability to respond.

61. In the alternative, Defendants' conduct was negligent within the meaning of 15 U.S.C. § 1681o.

**COUNT I**

**Violation of 15 U.S.C. § 1681e(b)**

**(Against Equifax)**

62. Plaintiff incorporates by reference each of the preceding paragraphs as though fully set forth herein.

63. Equifax prepared and published consumer reports concerning Plaintiff that contained information about her that was inaccurate or materially misleading, including the October 2025 and November 2025 delinquency codes, the "Account closed; was 60 – 80 Days Past Due" status, the Date of First Delinquency of 10/01/2025, and the representation that the account was "Open" and "Late 60 Days."

64. Equifax failed to follow reasonable procedures to assure maximum possible accuracy of that information, in violation of 15 U.S.C. § 1681e(b).

65. Equifax's failure is demonstrated by, among other things, its publication of three different past-due figures for the same two months within a five-day span; its publication of two different account closing dates, neither matching the furnisher's payoff date; its publication of a Date of First Delinquency mathematically inconsistent with the account's own terms; its publication of a "$0.00" high credit alongside a $36,642 obligation; and its continued publication, more than seven months after payoff, of the account as open and presently sixty days delinquent.

66. As a result, Plaintiff suffered the damages described above and is entitled to actual damages, statutory damages, punitive damages, costs, and reasonable attorney's fees under 15 U.S.C. §§ 1681n and 1681o.

**COUNT II**

**Violation of 15 U.S.C. § 1681i**

**(Against Equifax)**

67. Plaintiff incorporates by reference each of the preceding paragraphs as though fully set forth herein.

68. Plaintiff disputed the completeness and accuracy of the RAC tradeline directly with Equifax on at least four occasions, triggering Equifax's duties under 15 U.S.C. § 1681i(a).

69. Equifax violated 15 U.S.C. § 1681i(a) by, among other things:

a. failing to conduct a reasonable reinvestigation to determine whether the disputed information was inaccurate, in violation of § 1681i(a)(1)(A);

b. failing to review and consider all relevant information submitted by Plaintiff, in violation of § 1681i(a)(4);

c. failing to delete or modify information that was inaccurate, incomplete, or could not be verified, in violation of § 1681i(a)(5)(A);

d. relying on verification from a source it had reason to know was unreliable; and

e. failing to maintain reasonable procedures to filter and verify disputed information in Plaintiff's file.

70. As a result, Plaintiff suffered the damages described above and is entitled to actual damages, statutory damages, punitive damages, costs, and reasonable attorney's fees under 15 U.S.C. §§ 1681n and 1681o.

**COUNT III**

**Violation of 15 U.S.C. § 1681e(b)**

**(Against Experian)**

71. Plaintiff incorporates by reference each of the preceding paragraphs as though fully set forth herein.

72. Experian prepared and published consumer reports concerning Plaintiff that contained information about her that was inaccurate or materially misleading, including the October 2025 thirty-day delinquency code, the November 2025 sixty-day delinquency code, and the "Times 30/60/90 Days Late — 1/1/0" field.

73. Experian failed to follow reasonable procedures to assure maximum possible accuracy of that information, in violation of 15 U.S.C. § 1681e(b).

74. Experian's failure is aggravated by the fact that it denied Plaintiff functional access to the very dispute channel through which the inaccuracy would ordinarily have been surfaced and corrected, while continuing to publish the derogatory information.

75. As a result, Plaintiff suffered the damages described above and is entitled to actual damages, statutory damages, punitive damages, costs, and reasonable attorney's fees under 15 U.S.C. §§ 1681n and 1681o.

## COUNT IV

### Violation of 15 U.S.C. § 1681i

### (Against Experian)

76. Plaintiff incorporates by reference each of the preceding paragraphs as though fully set forth herein.

77. Plaintiff disputed the completeness and accuracy of the RAC tradeline with Experian, and Experian expressly acknowledged receiving and acting on that dispute by conducting a reinvestigation and contacting the furnisher.

78. Experian violated 15 U.S.C. § 1681i(a) by, among other things:

   a. failing to conduct a reasonable reinvestigation, in violation of § 1681i(a)(1)(A);

   b. failing to review and consider all relevant information submitted by Plaintiff, including the account ledger and the furnisher's own written admissions, in violation of § 1681i(a)(4);

   c. failing to delete or modify information that was inaccurate, incomplete, or could not be verified, in violation of § 1681i(a)(5)(A); and

   d. relying on verification from a source it had reason to know was unreliable.

79. As a result, Plaintiff suffered the damages described above and is entitled to actual damages, statutory damages, punitive damages, costs, and reasonable attorney's fees under 15 U.S.C. §§ 1681n and 1681o.

## COUNT V

**Violation of 15 U.S.C. § 1681s-2(b)**

**(Against Regional Acceptance Corporation)**

80. Plaintiff incorporates by reference each of the preceding paragraphs as though fully set forth herein.

81. Equifax and Experian each notified RAC of Plaintiff's disputes pursuant to 15 U.S.C. § 1681i(a)(2), triggering RAC's duties under 15 U.S.C. § 1681s-2(b).

82. RAC violated 15 U.S.C. § 1681s-2(b) by, among other things:

a. failing to conduct a reasonable investigation with respect to the disputed information, in violation of § 1681s-2(b)(1)(A);

b. failing to review all relevant information provided by the consumer reporting agencies, in violation of § 1681s-2(b)(1)(B);

c. failing to report the results of its investigation to the consumer reporting agencies accurately, in violation of § 1681s-2(b)(1)(C);

d. failing to report to all consumer reporting agencies to which it had furnished the information that the information was incomplete or inaccurate, in violation of § 1681s-2(b)(1)(D); and

e. failing to modify, delete, or permanently block the reporting of information found to be inaccurate or incomplete or that could not be verified, in violation of § 1681s-2(b)(1)(E).

83. RAC's investigation was unreasonable as a matter of law. The dispute was capable of resolution by reference to a single document in RAC's exclusive possession — the account transaction ledger — which establishes that RAC received funds exceeding every amount then due, before every due date, and which records a Paid Through Date of November 23, 2025.

84. RAC's conduct was willful. RAC did not overlook its ledger; it examined the ledger, recited its contents to Plaintiff and to the CFPB, and then adopted a characterization of those entries that its own accounting contradicts. It then waived the very late fees that would have corroborated a delinquency, and blocked Plaintiff from responding.

85. As a result, Plaintiff suffered the damages described above and is entitled to actual damages, statutory damages, punitive damages, costs, and reasonable attorney's fees under 15 U.S.C. §§ 1681n and 1681o.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff Kristin Nicole Scripter respectfully requests that this Court enter judgment in her favor and against Defendants, and award the following relief:

a. Actual damages pursuant to 15 U.S.C. §§ 1681n(a)(1)(A) and 1681o(a)(1);

b. Statutory damages of not less than $100 and not more than $1,000 per Defendant pursuant to 15 U.S.C. § 1681n(a)(1)(A);

c. Punitive damages pursuant to 15 U.S.C. § 1681n(a)(2);

d. Costs and reasonable attorney's fees pursuant to 15 U.S.C. §§ 1681n(a)(3) and 1681o(a)(2);

e. Pre-judgment and post-judgment interest as permitted by law; and

f. Such other and further relief as this Court deems just and proper.

## **DEMAND FOR JURY TRIAL**

86. Plaintiff hereby demands a trial by jury on all issues so triable.

Dated: August 11, 2026

Respectfully submitted,

PLAINTIFF,
KRISTIN NICOLE SCRIPTER

By: /s/ Sergei Lemberg
Sergei Lemberg
LEMBERG LAW, L.L.C.
43 Danbury Road, 3rd Floor
Wilton, CT 06897
Telephone: (203) 653-2250
Facsimile: (203) 653-3424
slemberg@lemberglaw.com
Attorney for Plaintiff